Melissa HILLER, et al., Plaintiffs,

v.

**COUNTY OF SUFFOLK,**
et al., Defendants.

**No. CV–95–4496 VVP.**

United States District Court,
E.D. New York.

Feb. 20, 2001.

John Ray, Miller Place, NY, for Plaintiffs.

Theodore D. Sklar, Robert J. Cimino, Suffolk County Attorney, Hauppauge, NY, for Defendants.

## OPINION AND ORDER

POHORELSKY, United States Magistrate Judge.

Following a jury verdict in favor of the five plaintiffs, the parties have made various post-trial motions. The defendants have moved for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, and have moved in the alternative for a new trial or for a remittitur under Rule 59 of the Federal Rules of Civil Procedure. The plaintiffs have moved for an award of their attorneys fees and other costs. For the reasons below, the defendants' motion for judgment as a matter of law is GRANTED, their motion for a new trial is conditionally GRANTED on two independent grounds, and the plaintiffs' motion for attorneys' fees and costs is GRANTED in part.

### BACKGROUND

The plaintiffs brought this civil rights action to challenge the implementation of an affirmative action program by the Suffolk County Police Department. The program, known as the Cadet Program, had been adopted by the county legislature to redress the continuing underrepresentation of minorities on the police force. Notwithstanding the implementation of an aggressive recruitment program mandated by a consent decree entered into between the Department of Jus-

tice and the County in the 1980's, the number of black and Hispanic police officers remained substantially under the targets that had been set. The then Commissioner of the Police Department, Peter Cosgrove, proposed the program because of his awareness of the shortfall and because the Department had operational needs for minority officers to work as undercover operatives and in other capacities in minority communities.

From its inception, the Cadet Program was open only to a limited number of black and Hispanic candidates, and provided various benefits to those accepted, including free tuition at the Suffolk County Community College, to enable them to compete more effectively for positions on the police force. The Program did not guarantee employment on the police force, as employment still depended on the results of a competitive examination open to all persons. Successful graduates from the Program, however, were to be given a preference such that if they obtained a passing grade on the police examination they would be placed at the top of the list regardless of their scores. In other words, they would move ahead of others who scored higher than they, and would be hired first as positions in the police department became available.

Each of the plaintiffs sought admission to the Cadet Program but were denied because they were white. After filing charges of discrimination with the Equal Employment Opportunity Commission and receiving right-to-sue letters, they brought the instant action under federal and state laws, including section 1983, Title VII and the state Human Rights Law. Finding that the establishment of the Cadet Program did not pass the strict scrutiny required for governmental classifications that discriminate on the basis of race, Judge Seybert granted summary judgment to the plaintiffs on liability.

Following further proceedings regarding the issue of damages, the parties consented to resolution of the issue by this magistrate judge. In rulings prior to and during the ensuing trial, the court dismissed the claims against the individual defendants on grounds of immunity and limited the trial on damages to issues regarding the emotional distress

suffered by the plaintiffs because of the implementation of the Program. At the close of the evidence, before the case was submitted to the jury, the defendants moved for judgment as a matter of law on various grounds including those on which they now rely in making their post-verdict motion. The case was submitted to the jury, which rendered verdicts awarding $50,000 in damages for emotional distress to each of the five plaintiffs.

Following the verdict, the defendants timely renewed their motion for judgment as a matter of law, and moved in the alternative for a new trial and for remittitur. The plaintiffs cross-moved for an award of their attorneys' fees and expenses.

I.

■ Motions for judgment as a matter of law under Rule 50 are governed by the same standards as those that govern motions for summary judgment. See, e.g., *Piesco v. Koch*, 12 F.3d 332, 340 (2d Cir.1993). Thus, under Rule 50(a), "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As on summary judgment, the trial judge must draw all reasonable inferences, and resolve all credibility assessments, in favor of the non-moving party. *See United States v. One Parcel of Property Located at 121 Allen Place*, 75 F.3d 118, 121 (2d Cir.1996). The court may not itself weigh the credibility of witnesses or consider the weight of the evidence. *DiSanto v. McGraw-Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000). Thus, judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]. *Id.*

■ The defendants' principal argument on this motion is that the plaintiffs have not

established a causal connection between the emotional injuries they suffered and the discriminatory conduct found unlawful by the court here. In assessing that argument, it is essential to specify with precision the unlawful conduct here. The unlawful conduct was the establishment of the Cadet Program itself, not the failure to accept the plaintiffs into the Program or to hire the plaintiffs as police officers. It was conceded that the plaintiffs were given the opportunity to take the competitive police examination, and that their scores placed them well down the list. Thus, even if the Cadet Program had never been instituted, the Police Department would never have offered any of the plaintiffs the opportunity to be police officers based on their scores on the competitive examination. Put simply, the institution of the Cadet Program, and the fact that the Program gave a preference in hiring to minorities, did not deprive any of the plaintiffs of a job.

The Cadet Program here is not unlike the preference system examined by the Supreme Court in *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). There, the city of Jacksonville, Florida adopted an affirmative action plan that set aside a certain percentage of the city's contracts solely for minority-owned businesses. The plaintiff was an association of general contractors most of whose members were excluded from bidding on and obtaining some of the city's contracts because of the set-aside program. Although the case concerned the issue of standing and not the question of damages, the Court examined the nature of the injury that such preference programs cause in the light of its leading decisions in discrimination cases. The Court concluded that "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." 508 U.S. at 666, 113 S.Ct. 2297. The application of that ruling to the issue of damages here is that it identifies the injury for which damages are to be awarded as compensation. The focus is not on the ultimate inability to obtain a benefit, but on the establishment of a scheme under which minorities were to be given exclusive access to a benefit.

This distinction is particularly important here since the preference afforded to participants in the Cadet Program did not in fact deprive any of the plaintiffs themselves of jobs as police officers. Accordingly, the court must review closely the plaintiffs' evidence concerning the emotional distress they suffered to determine whether there is a sufficient causal link between that distress and the defendants' implementation of the Cadet Program. Although emotional distress for discrimination that violates equal protection is compensable, the Supreme Court has been careful to require actual injury stemming from the discriminatory conduct. Thus, in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court held that such injury cannot be presumed, but rather must be proved by evidence of actual distress caused by the denial of the constitutional right. *See id.* at 260–64, 98 S.Ct. 1042. In that case, which dealt with the denial of procedural due process in connection with temporary suspensions of employment, the plaintiffs failed to prove that the denial of due process led to their suspensions. In holding that they could nevertheless recover damages for emotional distress, the Court took pains to specify that the plaintiffs had to prove that their distress flowed, not from the fact of the suspensions, which would have occurred in any event, but from the denial of due process itself. *See id.* at 263–64, 98 S.Ct. 1042. The Court reaffirmed this principle of causal connection in *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308–11, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), and the Second Circuit has applied the principle in various cases. *See, e.g., Townes v. the City of New York*, 176 F.3d 138, 147–49 (2d Cir.1999); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir.1999).

With these principles in mind, the court has examined the testimony of each of the plaintiffs in this action and finds that the evidence fails to establish the necessary causal link between the defendants' discriminatory conduct and the plaintiffs' emotional distress. The testimony of each of the plaintiffs

concerning their emotional distress focused almost entirely on their feelings of anguish because they did not realize their dreams of becoming police officers. The wrong here, to wit, the establishment and implementation of the Cadet Program, however, did not prevent them from becoming police officers. Put another way, the injury in fact suffered by the plaintiffs here, as explained by the Court in the *Northeastern Florida* decision, was that they were not given the same access to the opportunities afforded to minorities, not that they did not realize the benefits those opportunities may have afforded, namely, jobs as police officers. Thus, the emotional distress they suffered because they failed to become police officers was not caused, for damages purposes, by the defendants' wrongful conduct, and they therefore cannot recover for emotional distress stemming from their failure to become police officers.

Had the plaintiffs testified that they suffered distress when they were told that the Cadet Program was for minorities only, damages for that distress might be appropriate. There was no such testimony. All of the plaintiffs admitted that they were told from the outset that the Cadet Program was an affirmative action program for the benefit of minorities, but nevertheless pressed forward with their applications, apparently unmoved by the defendants' announcements concerning the Program's purpose.[1] Their distress commenced, according to their testimony, only when they received their rejection letters, thus dashing their dreams of becoming police officers.

Although no Second Circuit case has addressed this specific issue, the Fourth Circuit's decision in *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir.), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997), supports the above analysis. In that case, the defendant city sought to achieve a racial quota by promoting a number of African-American police officers to the position of sergeant, without regard to where they ranked on a promotional list established on the basis of scores on a competitive examination given to all candidates for the promotion. The plaintiffs were seven white police officers. None of them, however, ranked high enough to have been promoted to sergeant even if a preference had not been given to the African–American officers. In analyzing their claim for damages for emotional distress, the court in *Price* observed that the plaintiffs "were not competing on a level playing field—the cards were unlawfully stacked against them—and this denial of equal protection constitutes injury in fact capable of supporting compensatory damages." *Id.* at 1248. The court added, however, based on a review of the Supreme Court's precedents including the *Northeastern Florida* decision above, that to obtain damages for emotional distress the plaintiffs "must establish that their injury is grounded in the denial of equal protection, not their lack of promotions." *Id.* The court in *Price* went on to examine the testimony of each of the seven officers, and overturned the verdicts in favor of three of the officers because their testimony demonstrated that their distress could not be separated from their disappointment that they did not receive promotions.[2]

The situation here is identical. Drawing all favorable inferences in favor of the plaintiffs, their testimony establishes that their emotional distress is tied to, and cannot be separated from, their disappointment at not achieving their desires to become Suffolk County police officers. Their distress is thus the result, not of the denial of equal protection, but of the denial of the benefit of becoming police officers, a denial that the institution of the Cadet Program did not cause.

Although the plaintiffs have not sustained their burden of proving actual damages, they are entitled as a matter of law to nominal

---

1. Three of the plaintiffs—Ethridge, Sefton and Hiller—conceded that they were told at the outset that the Program was solely for minorities. The other two, Hogan and Duryee, testified that they were told the Program was an affirmative action program and was "minority-based," but denied understanding this to mean that it was limited to minorities.

2. The court also reversed the damages awards for emotional distress as to the other four officers, but on the grounds that their testimony did not provide sufficient evidence of emotional distress to warrant an award of damages.

damages because of the court's judgment that they were the victims of unlawful discrimination. *See, e.g., Carey v. Piphus,* 435 U.S. at 266–67, 98 S.Ct. 1042; *Amato v. City of Saratoga Springs,* 170 F.3d 311, 317 (2d Cir.1999). Accordingly, judgment is to be entered for each of the plaintiffs in the amount of $1.

## II.

Under Rule 50(c) of the Federal Rules of Civil Procedure, if a court grants a renewed motion for judgment as a matter of law under Rule 50(b), then the court must also rule on any contemporaneously made motion for a new trial under Rule 59. In doing so, the court makes a conditional ruling, determining whether the motion should be granted if its judgment as a matter of law is vacated or reversed, and must set forth the grounds for granting or denying the motion. Any such conditional ruling under Rule 50(c) does not affect the finality of the Rule 50(b) judgment as a matter of law, but affords a basis for appellate review. *See* Fed.R.Civ.P. 50(c).

■ The standards for granting a Rule 59 motion are less stringent than those applicable to motions under Rule 50. Thus, the trial judge may weigh the evidence himself without viewing it in the light most favorable to the non-movant, and the motion may be granted even if substantial evidence may support the jury's verdict. *See Kwiatkowski v. Bear Stearns & Co.,* 126 F.Supp.2d 672, 683 (S.D.N.Y.2000) (*citing DLC Mgt. Corp. v. Town of Hyde Park,* 163 F.3d 124 (2d Cir. 1998)). Thus, a new trial may be granted if there was substantial error in the admission or exclusion of evidence or the court committed error in its jury instructions, but the court should grant a new trial only if it is convinced that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Shade v. Housing Authority of The City of New Haven,* No. 3:94 CV 00774(EBB), 2000 WL 620328 *2 (D.Conn. Apr.11, 2000) (*citing Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940) and *quoting Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir.1988)); ac-cord, *Katara v. D.E. Jones Commodities,* 835 F.2d 966, 970 (2d Cir.1987).

Although the defendants list four separate bases for granting a new trial, their argument essentially sets forth two grounds for their motion. First, they maintain that the court's instructions to the jury were erroneous and did not adequately inform the jury of the applicable law. Second, they argue that the jury's verdict was excessive. Both grounds have merit.

### A. *Erroneous Jury Instructions*

■ As set forth in the previous section, the injury in fact for which emotional distress damages can be awarded under *Carey v. Piphus* and its progeny is the defendants' establishment and implementation of the Cadet Program, not the denial of the benefit of a job as a police officer. Although the defendants requested an instruction to the jury that would prevent the jurors from awarding damages for the distress the plaintiffs suffered because they did not obtain the benefit of becoming police officers, the court did not fully appreciate the distinction *Carey* enunciated and denied the request. The court's instructions did not differentiate for the jury between distress suffered because of the adoption of the Cadet Program and distress suffered because the plaintiffs did not realize their dreams of becoming police officers. As a result, the plaintiffs were permitted to argue—and indeed it was the central theme of their counsel's summation—that the jury should consider the anguish they suffered because their dreams of being police officers were destroyed by the defendants.

Accordingly, after reviewing both the jury instructions and the summation of the plaintiffs' counsel, the court is convinced that the erroneous jury instructions coupled with the summation counsel was permitted to make because of those erroneous instructions led the jury to reach a seriously erroneous result in awarding damages. *See, e.g., Lightning Bolt Productions, Inc.,* 861 F.2d at 370; *Katara,* 835 F.2d at 970. Accordingly, the court conditionally grants a new trial on damages on this ground.

### B. Excessiveness of the Verdict

■ In considering the defendants' second contention, *viz.*, that a new trial is warranted because the damages awarded were excessive, the court must view the evidence and draw all factual inferences in favor of the appellee, and accord substantial deference to the jury's determination of factual issues. *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir.1993) (*quoting Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir.1982) and *Martell v. Boardwalk Enters.*, 748 F.2d 740, 750 (2d Cir.1984)). As the plaintiffs' claims here rest in part on federal statutes, the court may order a new trial only if the damages awarded are so excessive that they "shock the judicial conscience." *Scala*, 985 F.2d at 683. In making that determination, courts traditionally review damages awarded in similar cases, "bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir.1988). "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir.1995) (citing *Phelan v. Local 305 of the United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus.*, 973 F.2d 1050, 1064 (2d Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993)). If remittitur is employed, the trial court should remit the damage award to the maximum amount that would be upheld as not excessive. *See Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir.1990).

The plaintiffs offered only their own testimony to establish their claims for damages for emotional distress. Their testimony consisted largely of general statements of feelings of humiliation, stress, depression, anxiety or embarrassment, and several cited a certain loss of self-esteem. With the exception of Ms. Hiller, whose situation was some-what different from the other four plaintiffs, none of the plaintiffs sought or received any psychological treatment or counseling for their distress. The physical manifestations of their distress consisted of varying degrees of sleeplessness, and several of the plaintiffs attributed weight gain or loss to their emotional state. None, save perhaps Hiller, testified to any long-term physical manifestations.

Hiller's testimony established a somewhat higher degree of emotional distress. Because she was adopted and did not (at the time) know the races of her biological parents, Hiller did not have a firm idea of her race when she applied for the Cadet Program.[3] That ambivalence about her own racial identity led to more specific testimony about the degree and extent of her distress, and to additional physical manifestations of her distress including episodes of dizziness and fainting which she attributed at least in part to her rejection from the Cadet Program. She also saw a psychiatrist once about her symptoms, albeit at the suggestion of her attorney some years after the litigation had commenced.

The court has reviewed a number of employment discrimination cases with evidence of emotional distress similar to that offered by the plaintiffs here, and courts consistently have reduced awards to substantially more modest amounts than those awarded here. Thus, for example, in *Rivera v. Baccarat, Inc.*, 10 F.Supp.2d 318 (S.D.N.Y.1998), which involved a plaintiff who was terminated because of her national origin, the court faced testimony regarding emotional distress virtually indistinguishable from that described by the plaintiffs here. After reviewing a number of other similar cases, the court ordered a remittitur reducing damages for emotional distress from $125,000 to $20,000. *Id.* at 330–32. Similarly, in *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662 (S.D.N.Y.1995), a case also involving a termination with similar evidence of emotional distress, the court considered an extensive

---

**3.** Although she ultimately identified herself as white in connection with her application to the Cadet Program, she learned after the commencement of this litigation that her biological father was African–American and that she therefore qualified for the Program, a cruel irony usually confined to fables.

array of cases and authorities before ordering a remittitur reducing the plaintiff's damages for emotional distress to $20,000. Having reviewed those cases, the cases cited therein, and others, the court concludes that the maximum amount of damages to be awarded to the plaintiffs for emotional distress without shocking the judicial conscience is $20,000 for each of the plaintiffs Ethridge, Sefton, Hogan and Duryee, and $30,000 for the plaintiff Hiller. *See generally, Cowan v. Prudential Insurance Co. of America*, 852 F.2d 688, 691 (2d Cir.1988); *Ortiz-Del Valle v. National Basketball Ass'n*, 42 F.Supp.2d 334 (S.D.N.Y.1999); *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205 (N.D.N.Y.1999); *Borja–Fierro v. Girozentrale Vienna Bank*, No. 91 Civ. 8743, 1994 WL 240360 (S.D.N.Y. May 27, 1994). Thus, the court conditionally grants a new trial as to damages for each plaintiff who does not accept the remitted amount above.[4]

### III.

 The plaintiffs have moved for an award of their attorneys' fees and litigation expenses. Plaintiffs who are successful on at least some of their claims in civil rights cases are entitled to such awards, and the standards for making such awards are the same whether made under Title VII or 42 U.S.C. § 1988.[5] *See Hensley v. Eckerhart*, 461 U.S. 424, 433 & n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). A plaintiff may be considered a "prevailing party," and thus eligible for an award of attorneys' fees, even if he or she does not prevail on the central issue in a case or obtain the primary relief sought. *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 757 (2d Cir.1998). When a plaintiff has succeeded on less than all of the claims in the action, however, a reduction in the attorneys' fees award must be made if the claims on which the plaintiff failed to succeed are distinct, factually and legally, from claims upon which the plaintiff did succeed. *See Hensley v. Eckerhart*, 461 U.S. at 434–35, 103 S.Ct. 1933. Moreover, if a plaintiff has obtained only nominal damages when he or she has

sought only monetary and not equitable relief, an award of attorneys' fees is ordinarily not appropriate. *See Farrar v. Hobby*, 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Pino v. Locascio*, 101 F.3d 235, 238–39 (2d Cir.1996).

 "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. 1933. The rates to be used in calculating the starting point, often called the "lodestar," *see, e.g., Quaratino v. Tiffany & Co.*, 166 F.3d 422, 423–24 & n. 1 (2d Cir.1999), are the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *See Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir.1998) (*quoting Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The party seeking fees has the duty to provide evidence of the hours expended and the rates claimed. *See, e.g., Lewis v. Coughlin*, 801 F.2d 570, 577 (2d Cir.1986); *New York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir.1983). Time spent preparing the fee application itself is properly included in the lodestar calculation. *See, e.g., Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1183–84 (2d Cir.1996). The lodestar may be reduced to the extent the plaintiff was unsuccessful on claims that were distinct from those on which the plaintiff prevailed or if the plaintiff's degree of success on interrelated claims was limited. *Hensley v. Eckerhart*, 461 U.S. at 435–36, 103 S.Ct. 1933. Conversely, the lodestar may be increased if the attorney's efforts have achieved exceptional success. *Id.* at 435, 103 S.Ct. 1933.

 The above principles are easily applied in this case. The plaintiffs achieved success in obtaining a summary judgment determining that the institution of the Cadet Program violated section 1983, Title VII and

---

4. A deadline for accepting the remittitur will be set as necessary consistent with any ruling made by the circuit court on appeal.

5. The New York Human Rights Law does not provide for attorneys' fees except in cases of housing discrimination. *See* N.Y. Exec. Law § 297(9) & (10); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir.1997)

the New York Human Rights Law. This ruling, coupled with other events, led to the cancellation of that Program, and thus entitles the plaintiffs to an award of fees for the efforts expended by their counsel up to that point. Thereafter, however, the plaintiffs failed in their effort to obtain monetary damages, which was the only purpose for continuing the litigation after the Program was canceled. Accordingly, attorneys' fees are not appropriate for the efforts expended after summary judgment was granted, *see, e.g., Farrar v. Hobby,* 506 U.S. at 114, 113 S.Ct. 566; *Pino v. Locascio,* 101 F.3d at 238–39, except for time spent preparing the fee application.

■■■ The court has examined the submissions of the plaintiffs' counsel, which include contemporaneously kept time records and an affirmation of counsel concerning the rates charged and other matters relating to the determination of fees. The court finds that the time records are adequately detailed and that the rates charged are reasonable.[6] The court also finds that the hours expended for the various tasks for which fees are appropriately awarded are reasonable, except for a repetitive charge, usually of two tenths of an hour, which appeared at the beginning of most months on the billing statement. Apparently plaintiffs' counsel conducted a monthly meeting during which the firm reviewed the status of each case pending in the office. While this practice may be good office procedure, the hours thus expended should not be charged to the defendants since they did not advance the litigation, and they have been excluded from the court's computations. As to costs and expenses, for the reasons cited above the court similarly limits such recovery to those costs and expenses incurred prior to the court's summary judgment decision, and those associated with this fee application.

Based on the above considerations, the court calculates the attorneys' fees to be awarded to the plaintiffs as follows: 104.1 hours of time spent by lead counsel at $250 per hour; 5 hours of travel time by lead counsel at $200 per hour; 22.8 hours of associates' time at $150 per hour; and 1.9 hours of time spent by an associate not yet admitted to the bar at $135 per hour. This yields a total of $30,701.50. The court finds no exceptional circumstances justifying either an increase or a decrease from that amount. In addition, the plaintiffs are entitled to costs and expenses in the amount of $501.45.[7] To the extent 'that the plaintiffs are reimbursed for costs and expenses pursuant to this award, they may not separately claim them as costs to be taxed by the clerk of court.

### CONCLUSION

For the foregoing reasons, the court

1. grants the defendants' motion for judgment as a matter of law under Rule 50(b) and directs the entry of a judgment of nominal damages of $1.00 for each of the plaintiffs;

2. grants, conditionally, the defendants' motion for a new trial under Rule 59 because of erroneous jury instructions;

3. separately grants, conditionally, the defendants' motion for a new trial under Rule 59, because of the excessiveness of the verdicts, as to any plaintiff who does not accept the remittitur entered by the court; and

4. awards to the plaintiffs a total of $31,202.95 for attorneys' fees and costs.

6. Lead counsel charged $250 per hour for his own time (except for travel time which was charged at $200 per hour), $150 per hour for the time spent by his associates, and $135 per hour for the time spent by an associate who had not yet been admitted to the bar. All of these rates are in keeping with usual and customary rates for lawyers of comparable experience in this area.

7. In calculating the lodestar, the court included all charges for fees on the billing statement from 10/5/94 through the entry dated 9/29/97, except for those omitted for the monthly status meetings, and all costs and expenses on the billing statement from 12/13/94 through the entry dated 10/9/97. The court also included the various entries on the billing statement between 1/13/00 and 4/5/00 which cite the fee application, and the 2/4/00 entry relating to copying expenses. The billing statement was annexed to counsel's Affirmation in support of the fee application, and was updated in his Affirmation in Reply to include the additional charges for post-trial work.

The clerk of court is directed to enter judgment accordingly.

SO ORDERED.